**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

ANTHONY D. PHILLIPS,

     Petitioner,                       Civil No. 2:15-CV-10245
                                                HONORABLE NANCY G. EDMUNDS
v.                                      UNITED STATES DISTRICT JUDGE

BONITA HOFFNER,

     Respondent.

_____/

**OPINION AND ORDER DENYING THE PETITION FOR A WRIT OF HABEAS
CORPUS AND DECLINING TO ISSUE A CERTIFICATE OF APPEALABILITY OR
LEAVE TO APPEAL IN FORMA PAUPERIS**

     Anthony D. Phillips, ("Petitioner"), presently confined at the Lakeland Correctional

Facility in Coldwater, Michigan, filed a petition for a writ of habeas corpus pursuant to 28

U.S.C. § 2254, through his attorney James Sterling Lawrence, in which he challenges his

conviction for first-degree felony murder, M.C.L.A. 750.316. For the reasons that follow,

the petition for a writ of habeas corpus is **DENIED**.

**I. Background**

     Petitioner was convicted following a jury trial in the Wayne County Circuit Court.

This Court recites verbatim the relevant facts relied upon by the Michigan Court of Appeals,

which are presumed correct on habeas review pursuant to 28 U.S.C. § 2254(e)(1). *See*

*Wagner v. Smith,* 581 F.3d 410, 413 (6th Cir. 2009):

> This case arises from the 1987 murder of Lacey Tarver in Detroit. Tarver's
> body was discovered in his home on Piedmont (Piedmont house) on March
> 4, 1987. Several items were missing, including a computer, a small
> television, a VCR, a cassette player, Tarver's wallet, the keys to Tarver's car,
> and a stereo system. A basement window in the rear of the house was

1

broken and appeared to be the intruder's point of entry. There was blood on the wall beneath the window and on some of the broken pieces of glass, indicating that the intruder cut himself while entering.

The prosecution introduced evidence regarding the facts and circumstances surrounding the murder. Tarver and Carmen Allen, f/k/a Carmen Phillips, dated and were engaged for about four years. They lived together in the Piedmont house. Allen's daughter from a previous relationship also lived in the home. Tarver and Allen ended their relationship around Thanksgiving of 1986 and she subsequently moved out.

Defendant is Allen's brother. Allen also has a brother named Robert, or "Bobby." Allen testified that defendant, her mother, and her sister came over to the Piedmont house frequently when she and Tarver lived there together. Bobby visited less often. About a year before Allen and defendant broke up, someone broke into the Piedmont house. After the break-in, Allen's brother Bobby was not welcome at the house.

Allen testified that she did not know of any problems between Tarver and defendant; defendant was welcome in her home. Defendant and her father did all the plumbing, painting, and other work around the house. When Allen returned to Tarver's house about two weeks after their break-up to retrieve some of her belongings, defendant went with her to help. Allen testified that the week Tarver was murdered, she sent defendant to Tarver's house to retrieve a stove hood that Tarver did not want.

Erica Ridley, Tarver's daughter, was 11 years old when her father was killed. She recalled that her father was supposed to attend a birthday party for her great-aunt on Saturday, February 28, 1987, but he never arrived at the party. The family called Tarver's house all day but was unable to contact him. Debbie Moorer, Tarver's girlfriend at the time, was the last person to see Tarver alive; she was at his house on Thursday, February 26, 1987. After Moorer had not heard from Tarver for a few days, she left a note with Tarver's brother, Edgar Tarver. Edgar found the note in his mailbox in the early morning hours of March 4, 1987, and he went to Tarver's house to check on him. When Edgar arrived, he noticed that Tarver's car was in the driveway and there were lights on inside the house.

Edgar walked around the back of the house and saw that a basement window was broken. The back door was locked, but the front door was not. Inside, the house was in disarray and appeared as if someone ransacked the home. The lights in the hallway and kitchen were on. Edgar called for Tarver but got no response. He went further into the house and saw Tarver's feet sticking out of the northeast bedroom. Edgar then saw Tarver leaning against the wall with lots of blood all around him. Tarver appeared to be

2

dead.  He was still wearing a jacket.  Edgar called his wife, who called the police.  Edgar also noticed that some things were missing from the house, including some electronics and Tarver's wallet and car keys.

On March 4, 1987, Dr. Marilee Frasier conducted an autopsy on Tarver.  Dr. Frasier died before the 2010 trial, so Deputy Chief Medical Examiner Cheryl Loewe testified with the assistance of Dr. Frasier's records from the autopsy. Referencing Dr. Frasier's records, Dr. Loewe testified regarding the manner in which Tarver died.  Specifically, she explained that Tarver suffered multiple blows to the head that were consistent with blows inflicted by both the head and claw end of a hammer.  Tarver had a fractured left eye socket; there were no signs of defensive injuries on his hands or arms.  Dr. Loewe testified that there was no way to tell when Tarver was actually killed, but she estimated that he was probably killed a few days before March 4, 1987, based on the degree of rigor mortis and lack of decomposition.

Sergeant James A. Bivens from the Detroit Police Department (DPD) Homicide Section was part of the initial investigative team that responded to the murder scene at 11318 Piedmont.  He arrived there at approximately 2:30 a.m. on March 4, 1987, and found Tarver sitting on the floor, slumped against the wall.  Sergeant Bivens noticed blunt force injury near Tarver's left ear, a puncture wound on the right side of his neck and lacerations to his right ear.  A rear basement window showed evidence of forced entry. Someone removed the outer storm window and placed it on the ground.  In the bathroom, a Band–Aid box was on the sink and the peeled strips of a Band–Aid (the part that is peeled off before applying the Band–Aid) were on the floor.

Officer Carl Kimber, an evidence technician, worked the crime scene at the Piedmont house.  He collected items with suspected blood on them, took samples of blood from the walls and other immovable objects, and dusted for fingerprints.

The window in the basement bathroom was broken.  There was glass on the floor in the basement bathroom, indicating that the window was broken from the outside.  The southeast bedroom, right across the hall from Tarver's body, appeared ransacked.  Items were on the floor and drawers were pulled out of the nightstand.

Paula Lytle, who worked as a senior forensic serologist in the DPD Crime Lab in 1987, tested the items that Office Kimber collected for blood and blood type.  Lytle testified that she tested blood samples from defendant and Tarver and determined that they both had type O blood.  Lytle testified that a piece of broken glass found beneath the broken basement window tested positive for blood.  At one point, it appeared Lytle testified that she wrote "type B"

somewhere on or near the item, but she testified that her test results were inconclusive with respect to the blood on the glass and she could not determine the blood type. In addition, a tissue found on the kitchen table and a blue checkbook found inside a dresser drawer in a bedroom both tested positive for type O blood.

In 2008, police tested some of the evidence recovered from the crime scene at the Piedmont house for DNA. Jennifer Summers, an expert in serology at the Michigan State Police Forensic Science Division in the Biology Unit, confirmed the presence of blood on the tissue found on the kitchen table. Summers also confirmed the presence of blood on the blue checkbook. She submitted a sample of both of these items to the Michigan State Police Northville Crime Laboratory for DNA testing. Summers also confirmed that the piece of shattered glass from the basement window contained human blood on it. There was a very faint stain in the corner. Summers did not send this sample for further testing because "it appeared to be such a faint stain in concentration," and there were other samples with stronger bloodstains.

Catherine Maggert, an expert in DNA profiling and forensic scientist with the crime laboratory in Northville, conducted DNA testing on the blood on the tissue and on the checkbook. Maggert explained that to develop a DNA profile, she assembles data from 13 different areas, or loci, of a DNA sample. A 14th marker indicates gender. When she tested the blood on the tissue, Maggert was able to obtain reportable data for 12 of the 13 loci. With respect to the checkbook blood, Maggert obtained reportable data for only three of the 13 loci, along with the gender area. The three loci with reportable data matched the corresponding loci in the DNA profile of the tissue blood. Maggert was also able to conclude that both DNA samples were from a male. Maggert explained that degradation or breakdown of DNA could cause the lack of reportable data from a locus.

Andrea Halvorson, another forensic scientist who performs DNA analysis at the Northville crime lab, compared the DNA profiles from the tissue blood and checkbook with a DNA profile developed from a buccal swab obtained from defendant. With respect to the tissue blood, the 12 loci for which Maggert was able to collect data matched the corresponding loci in defendant's DNA. Halvorson testified that the probability of selecting an unrelated, random, African–American individual with 12 out of 13 loci matching the corresponding loci in the tissue blood DNA was one in four quadrillion. With respect to the checkbook blood, the three loci for which Maggert was able to collect data matched the corresponding loci in defendant's DNA. Halvorson explained that the probability of selecting an unrelated, random, African–American individual with the same DNA profile as the checkbook blood was one in 211.7 people.

4

On cross-examination, Halvorson testified that "the DNA from a sibling or ... even a cousin, an uncle, something like that would be more similar. Those DNA types would be more likely to be found in a member of your family than they would in just a random person." She explained that, "any sort of comparisons to [a] related individual would be a completely different statistic," and she agreed that the only way to eliminate a brother is to run a comparison test of the brother's DNA. Halvorson agreed that she did not receive any blood samples from defendant's brother. However, she explained that only identical twins have ever been found to have the same DNA profile and she agreed that two siblings should have different DNA profiles even though they share the same parents.

In March 1987, the DPD's Latent Fingerprint Unit received nine photographs of print lifts, which Officer Kimber lifted during his investigation at the Piedmont house. Officer John Frelich compared the lifted prints with known prints from defendant, and Fred Moore, a senior technician, verified Officer Frelich's work. Marci McCleary, an expert in latent fingerprint examination and comparison and current employee of the Latent Fingerprint Unit, reexamined the prints in 2010. She testified that of the nine print lifts received, three were unusable because they did not have at least nine different characteristics. A fourth print was from a Band–Aid box, found on the sink in the bathroom on the first floor. McCleary concluded that this print matched defendant's left thumb; she matched 14 different identification points between defendant's known print and the Band–Aid box print. None of the other prints matched defendant and there were some prints that neither matched defendant nor Tarver.

Finally, the prosecution called Officer Charles Braxton to testify that police seized a waist-length, black and yellow size large jacket from defendant's house during a search after Tarver's murder. The jacket had two suspected bullet holes in the left shoulder area. However, on cross-examination, Officer Braxton clarified that he was probably just an observer during the execution of the search warrant and that he did not remember if he actually saw the jacket. Officer Braxton and Lytle testified that there was blood on the inside of the jacket near the left shoulder area. Lytle testified that the jacket tested positive for type O human blood.

During rebuttal argument, the prosecutor referenced that police seized the jacket from defendant's home and mentioned that it had type O blood inside. The prosecutor argued:

> Is it the deceased['s] blood or is it the defendant's blood? I really can't tell you that.
>
> It's possible it could be either one of those, all right.

5

It' possible that it could very well be the defendant's blood after he was cut and everything, stuck his hand back in the jacket and got it there.

Following four days of trial testimony, the jury convicted defendant and the trial court sentenced him as set forth above. Thereafter, defendant filed a claim of appeal in this Court and subsequently moved for a new trial, an evidentiary hearing, and judgment notwithstanding the verdict. In his motion, defendant raised the same issues that he now raises on appeal including his argument that the prosecutor admitted false evidence when it introduced evidence of the jacket at trial. Defendant attached documentation to his motion to support his argument that police did not seize the jacket from his residence after the murder. Specifically, a DPD laboratory technician report indicated that the laboratory received the jacket on March 12, 1987, from Officer Kramer. Police executed a search warrant at defendant's home on March 11, 1987, at 9074 Westwood. However, the search warrant return indicated that police did not seize anything during the search. In addition, Officer Kramer wrote a memorandum on April 16, 1987, wherein he indicated that police did not seize anything during the search.

As noted above, at trial, the prosecution presented the testimony of Officer Braxton to establish that police seized the jacket with blood on the inside from defendant's home after Tarver's murder. Following defendant's motion for a new trial, the prosecution acknowledged that police did not seize the jacket during the search warrant related to this case. Police actually seized the jacket on September 11, 1986, in an unrelated incident before Tarver was murdered. However, the prosecution argued that the improper introduction of the evidence did not deny defendant a fair trial or affect the trial's outcome.

The trial court held an evidentiary hearing on June 2, 2011. Officer Braxton testified that he reviewed a laboratory analysis report for the jacket before testifying at trial. The report indicated that police seized the jacket from 9074 Westwood and that the laboratory received the jacket for analysis on March 12, 1987. Based on the information in the report, Officer Braxton assumed that police seized the jacket during the March 11, 1987 search of defendant's residence. Officer Braxton denied speaking with the trial prosecutor about deceiving the jury with his testimony. He explained that he did not discuss his testimony before trial with the prosecutor; the prosecutor just asked him to review the laboratory report.

The trial prosecutor also testified that he thought police seized the jacket during their execution of the search warrant on March 11, 1987 based on the date of the search warrant and the laboratory report. The test results for the jacket were included on the same report as the other evidence from the Tarver murder scene. He did not discover that his assumption was incorrect

6

until he read appellate counsel's motion for a new trial. The prosecutor testified that he did not intend to make Officer Braxton testify to something that was not true, and if he had known the truth, he would not have introduced the jacket evidence. Furthermore, he did not reference the jacket in his opening statement or initial closing argument and only mentioned the jacket during rebuttal in response to defense counsel's closing argument. There was nothing in the case file to indicate why Officer Kramer brought the jacket to the lab on March 12, 1987.

As discussed in more detail below, the trial court also heard testimony concerning defendant's ineffective assistance of counsel claim. The trial court denied defendant's motion for a new trial and for judgment notwithstanding the verdict.

*People v. Phillips*, No. 300533, 2013 WL 2223388, at *1–5 (Mich. Ct. App. May 21, 2013).

Petitioner's conviction was affirmed on appeal. *Id., lv. den.* 495 Mich. 882, 838

N.W.2d 151 (2013).

Petitioner seeks a writ of habeas corpus on the following grounds:

I. The evidence was insufficient to convict petitioner.

II. The court denied the right of confrontation, and the due process right to present a defense, by precluding legitimate questioning of witnesses, in several cases made even worse by allowing the prosecutor to inquire into the same subjects.

III. Petitioner was prejudiced by multiple confrontation violations involving testimony by one person about the actions and findings of another that the testifier did not personally witness.

IV. The prosecutor improperly inquired into the defense witness asking for an attorney.

V. The prosecutor improperly subverted the presumption of innocence.

VI. The prosecutor committed misconduct, denied due process, violated evidentiary rules, and tainted petitioner before the jury by presenting prejudicial false evidence.

VII. Petitioner was prejudiced by ineffective assistance of counsel.

## II.  Standard of Review

28 U.S.C. § 2254(d), as amended by The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), imposes the following standard of review for habeas cases:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–
>
> > (1)    resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> > (2)    resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

A decision of a state court is "contrary to" clearly established federal law if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or if the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000).  An "unreasonable application" occurs when "a state court decision unreasonably applies the law of [the Supreme Court] to the facts of a prisoner's case." *Id.* at 409.  A federal habeas court may not "issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 410-11.  "[A] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011)(citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).  Therefore, in order to obtain habeas relief in federal court, a state prisoner is required to show that the state

court's rejection of his or her claim "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington,* 562 U.S. at 103. A habeas petitioner should be denied relief as long as it is within the "realm of possibility" that fairminded jurists could find the state court decision to be reasonable. *See Woods v. Etherton,* 136 S. Ct. 1149, 1152 (2016).

The Court notes that the Michigan Court of Appeals reviewed and rejected petitioner's second through sixth claims under a plain error standard because petitioner failed to preserve the issues as a constitutional claim at the trial court level.[1]

In *Fleming v. Metrish,* 556 F.3d 520, 532 (6th Cir. 2009), a panel of the Sixth Circuit held that the AEDPA deference applies to any underlying plain-error analysis of a procedurally defaulted claim. In a subsequent decision, the Sixth Circuit held that that plain-error review is not equivalent to adjudication on the merits, so as to trigger AEDPA deference. *See Frazier v. Jenkins*, 770 F.3d 485, 496 n. 5 (6th Cir. 2014). The Sixth Circuit noted that "the approaches of *Fleming* and *Frazier* are in direct conflict." *Trimble v. Bobby*, 804 F.3d 767, 777 (6th Cir. 2015). When confronted by conflicting holdings of the Sixth Circuit, this Court must follow the earlier panel's holding until it is overruled by the United States Supreme Court or by the Sixth Circuit sitting *en banc*. *See Darrah v. City of Oak Park,* 255 F.3d 301, 310 (6th Cir. 2001). This Court believes that the AEDPA's deferential standard of review applies to these claims, even though they were reviewed

---

[1] Respondent urges this Court to deny these claims on the ground that they are procedurally defaulted because petitioner failed to object at trial. Petitioner argues in his seventh claim that counsel was ineffective for failing to object. Ineffective assistance of counsel may establish cause for procedural default. *Edwards v. Carpenter*, 529 U.S. 446, 451-52 (2000). Given that the cause and prejudice inquiry for the procedural default issue merges with an analysis of the merits of petitioner's defaulted claims, it would be easier to consider the merits of these claims. *See Cameron v. Birkett,* 348 F. Supp. 2d 825, 836 (E.D. Mich. 2004).

only for plain error.

### III.  Discussion

**A. Claim # 1.  The sufficiency of evidence claim.**

Petitioner first contends that there was insufficient identity to establish his identity

as the murderer.  The Michigan Court of Appeals rejected petitioner's claim as follows:

> In this case, the only issue in dispute was the identity of Tarver's murderer.
> Having reviewed the record, we conclude that the prosecutor presented
> sufficient evidence that would allow a reasonable juror to find defendant
> guilty of felony murder beyond a reasonable doubt.  The evidence showed
> that someone entered Tarver's house by breaking a basement window.
> During this process, that individual cut himself, as there was blood on the
> shattered window glass.  A tissue with blood on it was on the kitchen table.
> Expert testimony showed that defendant's DNA matched the DNA on the
> bloody tissue on 12 of 13 loci.  Defendant's fingerprint was on a box of
> Band–Aids in the bathroom, and it appeared that a Band–Aid was recently
> used.  The box was sitting on the bathroom sink and there were the peeled
> strips from the back of the Band–Aid on the bathroom floor.  In addition,
> there was blood on a checkbook in the dresser drawer in the southeast
> bedroom of the home.  Expert testimony showed that the defendant's DNA
> matched the DNA on the checkbook on 3 of 13 loci.  While any of this
> evidence alone might not be sufficient to support defendant's conviction,
> taken as a whole and drawing all reasonable inferences in favor of the jury
> verdict, it was sufficient.  It was reasonable for the jury to infer that
> defendant left the bloody tissue on the kitchen table after he cut himself
> breaking into Tarver's basement, used a Band–Aid to cover his wound, and
> left his blood on the checkbook while ransacking the southeast bedroom,
> either before or after killing Tarver.
>
> Defendant argues that there was insufficient evidence because the
> prosecution must negate all reasonable theories of innocence.  However,
> our Court has specifically rejected that proposition and instead held that
> evidence is sufficient "if the prosecution proves its theory beyond a
> reasonable doubt in the face of whatever contradictory evidence the
> defendant may provide." Here, the prosecution proved defendant's guilt
> beyond a reasonable doubt given the evidence presented by defendant.
>
> *People v. Phillips*, 2013 WL 2223388, at *6 (internal footnotes omitted).

It is beyond question that "the Due Process Clause protects the accused against

10

conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In Re Winship,* 397 U.S. 358, 364 (1970). But the critical inquiry on review of the sufficiency of the evidence to support a criminal conviction is, "whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 318 (1979). This inquiry does not require a court to "ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt." Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Id.* at 318-19 (internal citation and footnote omitted)(emphasis in the original).

A federal habeas court may not overturn a state court decision that rejects a sufficiency of the evidence claim simply because the federal court disagrees with the state court's resolution of that claim. Instead, a federal court may grant habeas relief only if the state court decision was an objectively unreasonable application of the *Jackson* standard. *See Cavazos v. Smith,* 132 S. Ct. 2, 4 (2011). "Because rational people can sometimes disagree, the inevitable consequence of this settled law is that judges will sometimes encounter convictions that they believe to be mistaken, but that they must nonetheless uphold." *Id.* For a federal habeas court reviewing a state court conviction, "the only question under *Jackson* is whether that finding was so insupportable as to fall below the threshold of bare rationality." *Coleman v. Johnson*, 132 S.Ct. 2060, 2065 (2012).

On habeas review, a federal court does not reweigh the evidence or redetermine the credibility of the witnesses whose demeanor was observed at trial. *Marshall v. Lonberger*, 459 U.S. 422, 434 (1983). It is the province of the factfinder to weigh the

11

probative value of the evidence and resolve any conflicts in testimony. *Neal v. Morris*, 972 F.2d 675, 679 (6th Cir. 1992). A habeas court therefore must defer to the fact finder for its assessment of the credibility of witnesses. *Matthews v. Abramajtys*, 319 F.3d 780, 788 (6th Cir. 2003). The Court does not apply the reasonable doubt standard when determining the sufficiency of evidence on habeas review. *Walker v. Russell*, 57 F.3d 472, 475 (6th Cir. 1995).

Under Michigan law, "[T]he identity of a defendant as the perpetrator of the crimes charged is an element of the offense and must be proved beyond a reasonable doubt." *Byrd v. Tessmer*, 82 F.App'x. 147, 150 (6th Cir. 2003)(citing *People v. Turrell*, 25 Mich. App. 646, 181 N.W.2d 655, 656 (1970)).

Circumstantial evidence alone is sufficient to support a conviction, and it is not necessary for the evidence at trial to exclude every reasonable hypothesis except that of guilt. *Johnson v. Coyle,* 200 F.3d 987, 992 (6th Cir. 2000)(internal quotations omitted). Identity of a defendant can be inferred through circumstantial evidence. *See Dell v. Straub,* 194 F. Supp. 2d 629, 648 (E.D. Mich. 2002). Eyewitness identification is not necessary to sustain a conviction. *See United States v. Brown,* 408 F.3d 1049, 1051 (8th Cir. 2005); *Dell v. Straub,* 194 F. Supp. 2d at 648.

In the present case, there was sufficient circumstantial evidence from which a rational trier of fact could have concluded that petitioner murdered Mr. Tarver. The evidence showed that the person who broke into Mr. Tarver's house cut himself, because there was blood on the shattered window glass. A tissue with blood on it was found on the victim's kitchen table. Petitioner's DNA matched the DNA on the bloody tissue on 12 of 13 loci. Petitioner's thumbprint was recovered from a box of Band–Aids in the bathroom.

It appeared to the police that a Band–Aid was recently used, because the Band-Aids box was sitting on the bathroom sink and there were peeled strips from the back of the Band–Aid on the bathroom floor.  Police found blood on a checkbook in the dresser drawer in the southeast bedroom of the home.  Expert testimony showed that petitioner's DNA matched the DNA on the checkbook on 3 of 13 loci.  The recovery of petitioner's DNA and fingerprint from several sites at the victim's house was sufficient in and of itself to establish petitioner's identity as the perpetrator. *See e.g. U.S. v. Seawood,* 172 F.3d 986, 988 (7th Cir. 1999).  As the Michigan Court of Appeals noted, the jury could have reasonably inferred that petitioner left the bloody tissue on the kitchen table after he cut himself breaking into Mr. Tarver's basement, used a Band–Aid to cover his wound, and left his blood on the checkbook while ransacking the southeast bedroom, either before or after murdering the victim.

Because there were multiple pieces of evidence to establish petitioner's identity as the perpetrator, the Michigan Court of Appeals did not unreasonably apply *Jackson v. Virginia* in rejecting petitioner's sufficiency of evidence claim. *See Moreland v. Bradshaw,* 699 F.3d 908, 919-21 (6th Cir. 2012).  Petitioner's first claim is without merit.

**B.  Claim # 2.  The right to present a defense claim.**

Petitioner next contends that he was denied the right to present a defense.

Just as an accused has the right to confront the prosecution's witnesses for the purpose of challenging their testimony, he or she also has the right to present his own witnesses to establish a defense.  This right is a fundamental element of the due process of law. *Washington v. Texas*, 388 U.S. 14, 19 (1967); *see also Crane v. Kentucky,* 476 U.S. 683, 690 (1986)("whether rooted directly in the Due Process Clause of the Fourteenth

13

Amendment, or in the Compulsory Process or Confrontation clauses of the Sixth Amendment, the Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense'")(internal citations omitted).  However, an accused in a criminal case does not have an unfettered right to offer evidence that is incompetent, privileged, or otherwise inadmissible under the standard rules of evidence. *Montana v. Egelhoff*, 518 U.S. 37, 42 (1996).  The Supreme Court has indicated its "traditional reluctance to impose constitutional constraints on ordinary evidentiary rulings by state trial courts." *Crane,* 476 U.S. at 689.  The Supreme Court gives trial court judges "wide latitude" to exclude evidence that is repetitive, marginally relevant, or that poses a risk of harassment, prejudice, or confusion of the issues. *Id.* (quoting *Delaware v. Van Arsdall,* 475 U.S. 673, 679  (1986)).  Rules that exclude evidence from criminal trials do not violate the right to present a defense unless they are "'arbitrary' or 'disproportionate to the purposes they are designed to serve.'" *United States v. Scheffer*, 523 U.S. 303, 308 (1998)(quoting *Rock v. Arkansas*, 483 U.S. 44, 56 (1987)).

Under the standard of review for habeas cases as enunciated in § 2254(d)(1), it is not enough for a habeas petitioner to show that the state trial court's decision to exclude potentially helpful evidence to the defense was erroneous or incorrect.  A habeas petitioner must show that the state trial court's decision to exclude the evidence was "an objectively unreasonable application of clearly established Supreme Court precedent." *See Rockwell v. Yukins,* 341 F.3d 507, 511-12 (6th Cir. 2003).  Additionally, "the Supreme Court has made it perfectly clear that the right to present a 'complete' defense is not an unlimited right to ride roughshod over reasonable evidentiary restrictions." *Id.* at p. 512.

Petitioner first claims that he was denied his right to present a defense because his

14

counsel was precluded from asking Officer Kimber about possible contamination of the evidence.

Petitioner's counsel questioned Officer Kimber in great detail about the procedures he used when collecting evidence and the possibility that the evidence might have been contaminated. (Tr, 8/24/10, pp. 84-89, 99-104, 106-108, 110-115, 133-136).  The judge sustained the prosecutor's objection when counsel, after asking Kimber about what other evidence technicians might have done with saline solution, asked him a hypothetical question about someone touching blood or a surface with saline solution. (*Id.*, p. 105). Because Officer Kimber was the person who collected the evidence and there was no basis in fact for the hypothetical, the question was irrelevant or speculative.

"The inquiry in reviewing a claim of improper exclusion of evidence is whether the evidence was rationally connected to the crime charged and, if its exclusion was so prejudicial as to deprive the defendant of a fundamentally fair trial." *Jones v. Smith,* 244 F. Supp. 2d 801, 814 (E.D. Mich. 2003).  The trial court's decision to preclude defense counsel from asking Officer Kimber a hypothetical question did not violate petitioner's right to confrontation or due process, because the evidence was only remotely relevant to raise questions about the possibility of the contamination of the evidence. *See Farley v. Lafler,* 193 F.App'x. 543, 546 (6th Cir. 2006).  Although "[t]he Confrontation Clause places meaningful limits on a trial judge's ability to exclude evidence under a state's rules of evidence, those limits are not relevant when the information in question has virtually no probative value[,]." *Id.* at 547.  Because defense counsel's hypothetical question was speculative, the trial court's refusal to permit him to ask Officer Kimber the question did not deprive petitioner of a fair trial.

15

Moreover, the judge's ruling was not so egregious that it effectively denied petitioner a fair trial, in light of the fact that petitioner was not completely barred from questioning Officer Kimber about his procedures at the crime scene and the possible contamination of the evidence. *See Fleming v. Metrish*, 556 F.3d at 535-36.  With the quantum of evidence on the defense theory in the record, this Court concludes that the petitioner was afforded "a meaningful opportunity to present a complete defense." *Allen v. Howes,* 599 F. Supp. 2d 857, 873 (E.D. Mich. 2009)(citing *Crane*, 476 U.S. at 690 (citation and internal quotations omitted)).

Petitioner next contends that the judge prevented him from questioning Ms. Allen about Mr. Tarver's house cleaning habits.

As the Michigan Court of Appeals noted in rejecting petitioner's claim, the trial judge initially refused to permit petitioner to ask this question because he had not provided a foundation for his questioning. *People v. Phillips*, 2013 WL 2223388, at *8.  Excluding evidence on the ground that the criminal defendant had failed to establish an adequate foundation for its admission under state law does not violate a defendant's right to present a defense. *See U.S. ex rel. Winters v. Mizell,* 644 F. Supp. 782, 793 (N.D. Ill. 1986); *see also Dell v. Straub,* 194 F. Supp. 2d at 644 (Requiring a defendant to lay a foundation for the admissibility of certain evidence does not violate the Confrontation Clause).   In any event, once defense counsel demonstrated that Ms. Allen had been back to Mr. Tarver's house after moving out, petitioner was able to question her about the condition of Mr. Tarver's house during those visits.  With the quantum of evidence on the defense theory in the record, petitioner was given "a meaningful opportunity to present a complete defense." *Allen v. Howes,* 599 F. Supp. 2d at 873.

16

Petitioner next claims that the trial judge improperly prevented counsel from questioning Ms. Allen about petitioner's visits to Mr. Tarver's house, in order to give an innocent explanation why petitioner's blood and thumbprint were recovered from the house.

The Michigan Court of Appeals rejected this claim as follows:

> In this instance, the court precluded the questioning because defendant failed to establish that Allen had personal knowledge of how defendant's fingerprint got on the Band–Aid box or how a tissue with his blood got on the kitchen table in Tarver's house. Furthermore, defendant was able to solicit testimony from Allen about instances when defendant was at Tarver's house after she and Tarver stopped dating. Allen testified that defendant helped her move her things out of the house in December 1986 and went to Tarver's house to receive a stove hood the week he was murdered.

*People v. Phillips*, 2013 WL 2223388, at *8.

In the present case, the trial court's decision to prevent Ms. Allen from testifying about how petitioner's fingerprint got on a Band-Aid box or how his blood got on the tissue did not deprive petitioner of a fair trial, because testimony beyond Ms. Allen's personal knowledge would have violated M.R.E. 602 and was therefore properly excluded under the rules of evidence. *See McCullough v. Stegall,* 17 F.App'x. 292, 296 (6th Cir. 2001).

Fourth, petitioner claims that trial court precluded counsel from questioning Ms. Allen about their brother Bobby's drug addiction and previous arrest for robbery charges, in order to establish that he was the actual murderer.

The Michigan Court of Appeals rejected petitioner's claim as follows:

> Here, even assuming that the court should have allowed the testimony as evidence of motive, defendant cannot show that any error affected the outcome of the proceedings. In this case, the jury heard evidence that would have allowed it to conclude that Bobby committed the murder. Allen testified that someone broke into the victim's home sometime before the murder and that, thereafter, Bobby was not welcome at the victim's home.

*People v. Phillips*, 2013 WL 2223388, at *8.

In light of the fact that petitioner was able to present evidence that his brother Bobby might have been the murderer, the trial court's refusal to permit petitioner to question Ms. Allen about Bobby's drug addiction or prior arrest did not deprive petitioner of a meaningful opportunity to present a defense. *See Wynne v. Renico,* 606 F.3d 867, 871 (6th Cir. 2010). Petitioner is not entitled to habeas relief on his second claim.

### C.  Claim # 3.  The Confrontation Clause claims.

Petitioner next claims that he was denied his right of confrontation was violated when several persons testified regarding the actions and findings of other individuals who did not testify at trial.

Out of court statements that are testimonial in nature are barred by the Sixth Amendment Confrontation Clause unless the witness is unavailable and the defendant has had a prior opportunity to cross-examine the witness, regardless of whether such statements are deemed reliable by the court. *See Crawford v. Washington,* 541 U.S. 36, 68-69 (2004).

Petitioner first contends that his right to confrontation was violated when Dr. Loewe was permitted to testify about the findings from the autopsy conducted by Dr. Frasier. The Michigan Court of Appeals agreed that Dr. Loewe's testimony violated petitioner's right to confrontation but found the error to be harmless because the cause of death was not at issue, only the identity of the murderer. *People v. Phillips*, 2013 WL 2223388, at *9.

Confrontation Clause violations are subject to harmless error review. *See Bulls v. Jones,* 274 F.3d 329, 334 (6th Cir. 2001). In *Brecht v. Abrahamson*, 507 U.S. 619, 637

18

(1993), the U.S. Supreme Court held that for purposes of determining whether federal habeas relief must be granted to a state prisoner on the ground of federal constitutional error, the appropriate harmless error standard to apply is whether the error had a substantial and injurious effect or influence in determining the jury's verdict. In determining whether a Confrontation Clause violation is harmless under *Brecht*, a court should consider the following factors: "(1) the importance of the witness' testimony in the prosecution's case; (2) whether the testimony was cumulative; (3) the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points; (4) the extent of cross examination otherwise permitted; and (5) the overall strength of the prosecution's case." *See Jensen v. Romanowski,* 590 F.3d 373, 379 (6th Cir. 2009)(citing *Delaware v. Van Arsdall*, 475 U.S. at 684).

In the present case, the autopsy had no bearing on petitioner's guilt because the cause of death was not at issue, only the identity of the perpetrator, which the autopsy shed no light on. Petitioner has failed to show that the admission of Dr. Frasier's autopsy report through Dr. Loewe' s testimony had a substantial and injurious effect or influence on the verdict. When "[V]iewed through the deferential lens of AEDPA, the state court's harmlessness ruling must stand" because based on the record in this case, the Michigan Court of Appeals reasonably rejected any potential error in the admission of the autopsy report as harmless error. *See Kennedy v. Warren,* 428 F.App'x. 517, 522, 523 (6th Cir. 2011).

Petitioner next contends that Marci McCleary's testimony about the fingerprints lifted from the crime scene violated his right of confrontation. McCleary testified that in 1987, Officers Frelich and Moore compared petitioner's fingerprints with the prints that

19

another officer lifted at the crime scene.  As the Michigan Court of Appeals noted, *People v. Phillips*, 2013 WL 2223388, at *9, Ms. McCleary did not mention the results of that comparison.  Instead, Ms. McCleary did her own comparison between the fingerprints and the prints recovered from the crime scene.

Any testimony by Officer McCleary concerning any prior fingerprint comparisons was harmless error at most, in light of the fact that these findings were cumulative of Officer McCleary's testimony, who was subject to cross-examination at petitioner's trial. *See U.S. v. Barnes,* 183 F.App'x. 526, 530-31 (6th Cir. 2006).

Petitioner finally contends that Officer Braxton's testimony regarding the jacket recovered from petitioner's house during an earlier raid violated his right of confrontation. During direct examination, Officer Braxton agreed that the "file" reflected that the police executed a search warrant at petitioner's residence and that a jacket was seized during the execution of that warrant and was delivered to the police crime laboratory.  As the Michigan Court of Appeals noted in rejecting petitioner's claim, any error in Officer Braxton's testimony that he reviewed the file for the search warrant was offset by the fact that he actually participated in the execution of the search warrant.  Furthermore, petitioner's jacket was not highly probative of petitioner's guilt. *Phillips,* 2013 WL 2223388, at *9.  Officer Braxton's testimony about the search warrant and the jacket recovered from petitioner's house was harmless error because the jacket did not implicate petitioner in the murder, particularly where there was other ample evidence linking petitioner to the crime. *See e.g. U.S. v. Driver,* 535 F.3d 424, 428 (6th Cir. 2008).  Petitioner is not entitled to relief on his third claim.

### D.  Claims # 4, 5, and 6.  The prosecutorial misconduct claims.

20

Petitioner claims he was denied his right to a fair trial because of prosecutorial misconduct.

"Claims of prosecutorial misconduct are reviewed deferentially on habeas review." *Millender v. Adams*, 376 F.3d 520, 528 (6th Cir. 2004)(citing *Bowling v. Parker*, 344 F. 3d 487, 512 (6th Cir. 2003)).   A prosecutor's improper comments will be held to violate a criminal defendant's constitutional rights only if they "'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Darden v. Wainwright*, 477 U.S. 168, 181 (1986)(quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)). Prosecutorial misconduct will thus form the basis for habeas relief only if the conduct was so egregious as to render the entire trial fundamentally unfair based on the totality of the circumstances. *Donnelly v. DeChristoforo*, 416 U.S. at 643-45.   In order to obtain habeas relief on a prosecutorial misconduct claim, a habeas petitioner must show that the state court's rejection of his or her prosecutorial misconduct claim "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Parker v. Matthews*, 132 S. Ct. 2148, 2155 (2012)(quoting *Harrington*, 562 U.S. at 103).

In his fourth claim, petitioner contends that the prosecutor committed misconduct when he asked Ms. Allen about the fact that she had refused to sign a statement that she made to the police on March 11, 1987 until she spoke with a lawyer.

A prosecutor may not imply that an accused's decision to meet with counsel, even shortly after the incident which gives rise to the criminal charges, implies guilt.   A prosecutor must also refrain from suggesting to the jury that a defendant hired an attorney to generate an alibi or to get his or her "story straight". *Sizemore v. Fletcher*, 921 F.2d 667,

21

671 (6th Cir. 1990)(internal citations omitted).  However, the Supreme Court has never held that a prosecutor cannot question a witness other than a defendant about whether he or she consulted with a lawyer.  Given the lack of holdings by the Supreme Court on the issue of whether a prosecutor can question a witness about consulting with an attorney, the Michigan Court of Appeals' rejection of petitioner's prosecutorial misconduct claim was not an unreasonable application of clearly established federal law. *See Wright v. Van Patten,* 552 U.S. 120, 126 (2008); *Carey v. Musladin,* 549 U.S. 70, 77 (2006).

In his fifth claim, petitioner contends that the prosecution improperly subverted the presumption of innocence by arguing that "there's no such thing as a free murder" during his opening statement and closing argument.  The Michigan Court of Appeals rejected petitioner's claim as follows:

> Contrary to defendant's assertions, the prosecution was merely remarking on the long passage of time since Tarver's murder and arguing that the jury should not acquit simply because the murder occurred 23 years ago.  The prosecutor did not encourage the jury to convict defendant even if it did not find him guilty beyond a reasonable doubt.  Finally, any error could have been cured by an objection and curative instruction.  Indeed, the court instructed the jury that defendant is presumed innocent and must be found guilty beyond a reasonable doubt, and the jury is presumed to have followed its instructions.

*People v. Phillips*, 2013 WL 2223388, at *11 (internal citations omitted).

Petitioner is not entitled to habeas relief because in the context of his comments, the prosecutor did not undermine the concept of the presumption of innocence. *See Bowling v. Parker,* 344 F.3d at 513.  In addition, the prosecutor's comments did not render petitioner's trial fundamentally unfair in light of the fact that the trial court gave the jury the correct instruction on the presumption of innocence. *See Kellogg v. Skon,* 176 F.3d 447, 451 (8th Cir. 1999).

Petitioner next contends that the prosecutor committed misconduct by permitting Officer Braxton to testify falsely that the jacket had been seized from petitioner's house at the time of the murder in 1987, when in fact it had been seized earlier in 1986.

The deliberate deception of a court and jurors by the presentation of known and false evidence is incompatible with the rudimentary demands of justice. *Giglio v. United States*, 405 U.S. 150, 153 (1972).   There is also a denial of due process when the prosecutor allows false evidence or testimony to go uncorrected. *Napue v. Illinois*, 360 U.S. 264, 269 (1959)(internal citations omitted).   To prevail on a claim that a conviction was obtained by evidence that the government knew or should have known to be false, a defendant must show that the statements were actually false, that the statements were material, and that the prosecutor knew they were false. *Coe v. Bell*, 161 F.3d 320, 343 (6th Cir. 1998).   A habeas petitioner must show that a witness' statement was "indisputably false," rather than misleading, to establish a claim of prosecutorial misconduct or a denial of due process based on the knowing use of false or perjured testimony. *Byrd v. Collins*, 209 F.3d 486, 517-18 (6th Cir. 2000).   Conclusory allegations of perjury in a habeas corpus petition must be corroborated by some factual evidence. *Barnett v. United States*, 439 F.2d 801, 802 (6th Cir.1971).

Petitioner is not entitled to relief on his claim because he failed to show that Officer Braxton intentionally testified falsely about seizing the jacket from petitioner's residence on March 11, 1987.   Officer Braxton testified at the post-trial evidentiary hearing that he reviewed a laboratory analysis report for the jacket before testifying at trial.   The report stated that police seized the jacket from 9074 Westwood and that the laboratory received the jacket for analysis on March 12, 1987.   Officer Braxton testified that he assumed from

23

reading this report that the police seized the jacket during the March 11, 1987 search of petitioner's home.  Officer Braxton denied that he spoke with the trial prosecutor about deceiving the jury with his testimony.  Officer Braxton denied even speaking with the prosecutor about his proposed testimony prior to trial.  The prosecutor just asked him to review the laboratory report.  The trial prosecutor testified at the post-evidentiary hearing that he also thought that the police seized the jacket during their execution of the search warrant on March 11, 1987 based upon on the date of the search warrant and the laboratory report.  The test results for the jacket were included on the same report as the other evidence from the Tarver murder scene.  The trial prosecutor did not learn that his assumption was incorrect until he read appellate counsel's motion for a new trial.  The prosecutor testified that he did not intend to make Officer Braxton testify falsely about this matter.  The trial judge, in rejecting petitioner's post-trial motion for a new trial, found the prosecutor's testimony to be credible.

Petitioner is not entitled to habeas relief on his claim because he failed to show that Officer Braxton deliberately testified falsely about the date that the jacket was seized from petitioners home.  Petitioner's claim also fails because he failed to show that the prosecutor knew that Officer Braxton testified falsely about the seizure of the jacket from petitioner's residence on March 11, 1987. *See Rosencrantz v. Lafler,* 568 F.3d 577, 587 (6th Cir. 2009).  Petitioner is also not entitled to relief because the jacket was not material to petitioner's conviction, because it was not a "crucial link" in the case against petitioner. *See e.g. Foley v. Parker,* 488 F.3d 377, 392 (6th Cir. 2007).  The jacket was never linked to the murder or even to petitioner.  Accordingly, petitioner is not entitled to relief on his sixth claim.

**E. Claim # 7.  The ineffective assistance of counsel claims.**

Petitioner contends that he was denied the effective assistance of trial counsel.

To show that he or she was denied the effective assistance of counsel under federal constitutional standards, a defendant must satisfy a two prong test.  First, the defendant must demonstrate that, considering all of the circumstances, counsel's performance was so deficient that the attorney was not functioning as the "counsel" guaranteed by the Sixth Amendment. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). In so doing, the defendant must overcome a strong presumption that counsel's behavior lies within the wide range of reasonable professional assistance. *Id.*  Petitioner must overcome the presumption that, under the circumstances, the challenged action might be sound trial strategy. *Strickland,* 466 U.S. at 689.  Second, the defendant must show that such performance prejudiced his defense. *Id.*  To demonstrate prejudice, the defendant must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 694. The Supreme Court's holding in *Strickland* places the burden on the defendant who raises a claim of ineffective assistance of counsel, and not the state, to show a reasonable probability that the result of the proceeding would have been different, but for counsel's allegedly deficient performance. *See Wong v. Belmontes*, 558 U.S. 15, 27 (2009).

On habeas review, "the question 'is not whether a federal court believes the state court's determination' under the *Strickland* standard 'was incorrect but whether that determination was unreasonable-a substantially higher threshold.'" *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009)(quoting *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007)).  "The pivotal question is whether the state court's application of the *Strickland*

25

standard was unreasonable. This is different from asking whether defense counsel's performance fell below *Strickland's* standard." *Harrington v. Richter*, 562 U.S. at 101. Indeed, "because the *Strickland* standard is a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard." *Knowles,* 556 U.S. at 123 (citing *Yarborough v. Alvarado*, 541 U.S. at 664). Pursuant to the § 2254(d)(1) standard, a "doubly deferential judicial review" applies to a *Strickland* claim brought by a habeas petitioner. *Id.* This means that on habeas review of a state court conviction, "[A] state court must be granted a deference and latitude that are not in operation when the case involves review under the *Strickland* standard itself."*Harrington*, 562 U.S. at 101. "Surmounting *Strickland's* high bar is never an easy task." *Id.* at 105 (quoting *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010)).

Petitioner first argues that his trial counsel was ineffective for failing to file a motion to quash the information, because he claims that there was insufficient evidence to bind him over to the circuit court for trial. As a related claim, petitioner argues that trial counsel was ineffective for failing to move for a directed verdict.

The Michigan Court of Appeals rejected petitioner's claim as follows:

> In this case, counsel made a strategic decision not to move to quash or for a directed verdict. This decision did not fall below an objective standard of reasonableness. As discussed above, there was sufficient evidence to allow a jury to conclude that defendant killed the victim including DNA and fingerprint evidence such that motions to quash or for a directed verdict would have been futile.

*People v. Phillips*, 2013 WL 2223388, at *13 (internal citation omitted).

There was sufficient evidence presented at the preliminary examination to support petitioner's bindover to circuit court. Accordingly, petitioner is unable to show that counsel

was ineffective for failing to file a motion to quash the information. *See e.g. Dell v. Straub,* 194 F. Supp. 2d at 649. The evidence was sufficient to prove petitioner's identity as the murderer, thus, counsel's failure to move for a directed verdict did not amount to ineffective assistance of counsel. *Maupin v. Smith*, 785 F.2d 135, 140 (6th Cir. 1986); *see also Hurley v. United States,* 10 F.App'x. 257, 261 (6th Cir. 2001).

Petitioner next contends that trial counsel was ineffective for advising him not to testify in his own defense. The Michigan Court of Appeals rejected this claim as follows:

> At the post-conviction evidentiary hearing, counsel testified regarding why he advised defendant not to testify. Counsel first stated that he did not have defendant testify because of information defendant told him in privileged conversations. He was not going to "suborn any perjury." Second, trial counsel said that he was concerned about defendant's 1987 conviction for assault with intent to do great bodily harm less than murder. Even though the conviction was more than 10 years old and did not deal with truth or dishonesty, counsel was worried that defendant would "open certain doors on direct examination." For example, defendant might actually say something about being a nonviolent person. In addition, counsel said it would have been "a monumental blunder" to have defendant testify because defendant would not have been able to explain how his blood was in Tarver's house.

> The trial court concluded that counsel did not render ineffective assistance in advising defendant not to testify. The court reasoned that counsel's concern about defendant's prior conviction might have been "overly cautious" but was not unsound. In addition, the court reasoned that counsel's advice was much more nuanced than defendant claimed it was and generally concerned the risks of defendant testifying.

> "Counsel's decision whether to call a witness is presumed to be a strategic one for which this Court will not substitute its judgment." The trial court found trial counsel credible with respect to the reasoning behind his advice. This finding was not clearly erroneous. Trial counsel's testimony at the evidentiary hearing showed that he had valid concerns regarding defendant's testimony. He did not want to "open the door" with respect to defendant's prior conviction and he had concerns about perjury and defendant' inability to explain the presence of his blood at the crime scene. Given counsel's legitimate concerns about defendant taking the stand, counsel made a strategic decision to advise defendant against testifying and

27

the trial court did not clearly err in finding that counsel acted reasonably in making that decision.

*People v. Phillips*, 2013 WL 2223388, at *14 (internal citations omitted).

Although the issue of ineffective assistance of counsel presents a mixed question of law and fact, any underlying historical facts found by the state courts are presumed correct. *West v. Seabold*, 73 F.3d 81, 84 (6th Cir. 1996). The presumption of correctness also "applies to implicit findings of fact, logically deduced because of the trial court's ability to adjudge the witnesses' demeanor and credibility." *Carey v. Myers*, 74 F.App'x. 445, 448 (6th Cir. 2003)(citing *McQueen v. Scroggy*, 99 F.3d 1302, 1310 (6th Cir. 1996)). The trial judge concluded that trial counsel testified credibly about his reasons for not wanting to put petitioner on the witness stand, including his concern that petitioner would commit perjury. Petitioner has presented no evidence to rebut the trial judge's credibility determination that counsel had valid reasons for not putting petitioner on the witness stand, particularly counsel's belief, based on his privileged conversations with petitioner, that his client would commit perjury. This credibility determination is buttressed by the fact that when trial counsel was recalled to testify during the post-conviction hearing and was ordered by the trial judge to divulge the contents of his privileged conversation with petitioner, counsel refused to do so even though it resulted in him being held in contempt of court and sentenced to jail. (Tr. 6/28/11, pp. 13-15).

A defendant cannot show prejudice based upon his or her counsel's refusal to present perjured testimony, even if such testimony might have affected the outcome of the case. *Lafler v. Cooper*, 132 S. Ct. 1376, 1387 (2012). Defense counsel's decision to discourage petitioner from testifying was not deficient, as required to support a claim of

28

ineffective assistance of counsel, because counsel believed that he would have been suborning perjury if petitioner had taken the witness stand. *See e.g. Mann v. Ryan*, 828 F.3d 1143, 1153 (9th Cir. 2016).  Petitioner is not entitled to relief on this claim.

Petitioner next claims that trial counsel was ineffective for failing to object to the Confrontation Clause errors that he alleged in Claim # 3, *supra*.

"The prejudice prong of the ineffective assistance analysis subsumes the *Brecht* harmless-error review." *Hall v. Vasbinder*, 563 F.3d 222, 236 (6th Cir. 2009).  This Court already determined that the admission of this evidence was harmless error.  Because the admission of this evidence was harmless error, petitioner cannot satisfy *Strickland's* prejudice requirement. *See e.g. Bell v. Hurley,* 97 F.App'x. 11, 17 (6th Cir. 2004).

Petitioner next contends that trial counsel was ineffective for failing to call an expert witness to challenge the DNA evidence.

The Michigan Court of Appeals rejected this claim as follows:

At the post-conviction evidentiary hearing, counsel testified that he retained an independent expert, but learned that the firm's findings were not beneficial to his client.  Counsel testified that he discussed strategies with the independent firm for addressing the DNA evidence at trial.  At trial, counsel advanced the theory that defendant's brother Bobby could have been the perpetrator.  Counsel explained that he did not want to have Bobby's DNA tested because the test could have eliminated Bobby as a potential perpetrator, which would have ruined defendant's defense.

The trial court concluded that counsel did not act deficiently in failing to retain an independent DNA expert.  The court found that counsel did retain an expert who advised counsel that the DNA evidence was not favorable to defendant.

In this case, the trial court did not clearly err in finding that counsel rendered effective assistance with respect to his handling of the DNA evidence.  Counsel retained an independent DNA expert.  When the independent expert's results were not favorable to his client, counsel decided not to obtain a written report or call any expert to testify at trial.  This was

29

reasonable strategy given the circumstances. Further, counsel made a reasonable strategic decision not to have Bobby's DNA tested given the results could have destroyed defendant's only defense. It is reasonable trial strategy not to seek further testing when the results could implicate the defendant. In sum, given all of the facts and circumstances of the case, counsel acted reasonably with respect to his handling of the DNA evidence and in deciding not to call an independent expert witness.

*People v. Phillips*, 2013 WL 2223388, at *16 (internal citation omitted).

Petitioner is not entitled to relief on his claim for several reasons.

First, trial counsel did retain an expert on DNA, but this expert advised counsel that his findings would not be favorable to petitioner. The constitution does not require counsel to look for more than one expert witness. "Effective assistance does not require counsel to continue contacting experts until he found one...willing to testify against the prosecution's theory of the case." *Flick v. Warren*, 465 F.App'x. 461 465 (6th Cir. 2012)(petitioner's counsel in a second-degree murder prosecution was not ineffective for failing to call an expert to challenge the science underlying Shaken Baby Syndrome, after counsel had contacted three doctors seeking help with the case and had received unfavorable responses from all three).

Secondly, petitioner failed to show that he has an expert witness who could successfully challenge the prosecution's DNA evidence. A habeas petitioner's claim that trial counsel was ineffective for failing to call an expert witness cannot be based on speculation. *See Keith v. Mitchell,* 455 F.3d 662, 672 (6th Cir. 2006). Petitioner has offered no evidence to this Court that there is an expert who would have impeached the DNA evidence offered by the prosecution.

Petitioner next contends that his trial counsel should have called petitioner's mother and other sister to testify as defense witnesses.

30

The Michigan Court of Appeals rejected petitioner's claim as follows:

Counsel testified that he did not call defendant's mother as a witness because he was able to get all of the information he needed from Allen. The trial court concluded that counsel did not act deficiently in failing to call other witnesses because defendant failed to demonstrate what important testimony other witnesses would have provided.

Defendant claims that his mother and sister would have testified about instances when defendant was at Tarver's house after Tarver and Allen broke up. However, Allen testified about Tarver and defendant's friendship and occasions when defendant visited Tarver's house after Tarver and Allen stopped living together. Presumably, Allen had the most knowledge of Tarver and defendant's relationship since she dated and lived with Tarver. Therefore, it was reasonable for counsel to decide to call Allen as a witness instead of defendant's mother or sister. To the extent defendant contends that his sister could have offered testimony about seizure of the jacket, as discussed above, admission of the jacket evidence did not affect the outcome of the proceedings. Therefore, defendant cannot show that there is a reasonable probably that but for counsel's failure to call his sister to testify at trial, the result of the proceeding would have been different.

*People v. Phillips*, 2013 WL 2223388, at *16.

Petitioner was not prejudiced by counsel's failure to call petitioner's mother and other sister to testify because their testimony was cumulative of Ms. Allen's testimony. *Wong,* 558 U.S. at 22-23; *see also United States v. Pierce,* 62 F.3d 818, 833 (6th Cir. 1995); *Johnson v. Hofbauer,* 159 F. Supp. 2d 582, 607 (E.D. Mich. 2001). In this case, the jury had significant evidence presented to it in support of petitioner's claim that he had been a guest at Mr. Tarver's home on multiple occasions, to support his argument that there were innocent reasons for his thumbprint and blood to have been recovered from the victim's house. Because the jury was "well acquainted" with evidence that would have supported petitioner's argument that his blood and thumbprint were not linked to the murder but could have been placed at the victim's house during a prior visit, additional evidence in support of petitioner's defense "would have offered an insignificant benefit, if

31

any at all." *Wong,* 558 U.S. at 23.  Moreover, petitioner was not prejudiced by counsel's failure to call petitioner's other sister to testify about the actual date that the jacket was seized from petitioner's house, because the jacket was not incriminating.

Petitioner next contends that trial counsel was ineffective for failing to object to the prosecutorial misconduct he alleged in Claims # 4 and # 5.  To show prejudice under *Strickland* for failing to object to prosecutorial misconduct, a habeas petitioner must show that but for the alleged error of his trial counsel in failing to object to the prosecutor's improper questions and arguments, there is a reasonable probability that the proceeding would have been different.  *Hinkle v. Randle,* 271 F.3d 239, 245 (6th Cir. 2001).  Because the Court has already determined that the prosecutor's comments did not deprive petitioner of a fundamentally fair trial, petitioner is unable to establish that he was prejudiced by counsel's failure to object to these remarks. *Slagle v. Bagley ,* 457 F.3d 501, 528 (6th Cir. 2006).

Petitioner also argues that trial counsel failed to object to Officer Braxton's perjured testimony.  Petitioner failed to show that Officer Braxton committed perjury, thus, counsel was not ineffective for failing to challenge this testimony on the ground that it was perjured. *Brown v. Burt*, 65 F.App'x. 939, 942 (6th Cir. 2003).

Petitioner finally contends that trial counsel was ineffective for failing to object to the admission of blood-type evidence.  The Michigan Court of Appeals rejected this claim on the ground that this evidence was admissible. *People v. Phillips*, 2013 WL 2223388, at *17.

Federal habeas courts "'must defer to a state court's interpretation of its own rules of evidence and procedure' when assessing a habeas petition." *Miskel v. Karnes*, 397 F.3d

446, 453 (6th Cir. 2005)(quoting *Allen v. Morris*, 845 F.2d 610, 614 (6th Cir. 1988)). Because the Michigan Court of Appeals determined that most, not all, of this evidence was admissible under Michigan law, this Court must defer to that determination in resolving petitioner's ineffective assistance of counsel claim. *See Brooks v. Anderson*, 292 F.Appx. 431, 437-38 (6th Cir. 2008). The failure to object to relevant and admissible evidence is not ineffective assistance of counsel. *See Alder v. Burt,* 240 F. Supp. 2d 651, 673 (E.D. Mich. 2003). Petitioner is not entitled to relief on this claim.

## IV. Conclusion

The Court will deny the petition for a writ of habeas corpus with prejudice. The Court will also deny a certificate of appealability to petitioner. In order to obtain a certificate of appealability, a prisoner must make a substantial showing of the denial of a constitutional right. 28 U.S.C. § 2253(c)(2). To demonstrate this denial, the applicant is required to show that reasonable jurists could debate whether, or agree that, the petition should have been resolved in a different manner, or that the issues presented were adequate to deserve encouragement to proceed further. *Slack v. McDaniel*, 529 U.S. 473, 483-84 (2000). "The district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." Rules Governing § 2254 Cases, Rule 11(a), 28 U.S.C. foll. § 2254; *see also Strayhorn v. Booker,* 718 F. Supp. 2d 846, 875 (E.D. Mich. 2010).

For the reasons stated in this opinion, the Court will deny petitioner a certificate of appealability because he has failed to make a substantial showing of the denial of a federal constitutional right. *See Allen v. Stovall,* 156 F. Supp. 2d 791, 798 (E.D. Mich. 2001). The Court will also deny petitioner leave to appeal *in forma pauperis*, because the

appeal would be frivolous. *Id.*

## IV. <u>ORDER</u>

Based upon the foregoing, IT IS ORDERED that the petition for a writ of habeas corpus is **DENIED WITH PREJUDICE.**

IT IS FURTHER ORDERED That a certificate of appealability is **DENIED.**

IT IS FURTHER ORDERED that Petitioner will be **DENIED** leave to appeal *in forma pauperis.*

s/ Nancy G. Edmunds
**HONORABLE NANCY G. EDMUNDS**
UNITED STATES DISTRICT JUDGE

Dated: December 19, 2016

CERTIFICATE OF SERVICE

I hereby certify that a copy of this order was served upon the parties and/or counsel of record on this 19th day of December, 2016 by regular U.S. mail and/or CM/ECF.

s/ Carol J Bethel
Case Manager